Hear ye, hear ye, hear ye. The United States Court of Appeals for the 5th Circuit is now open according to law. God save the United States and the Honorable Court. Good morning, counsel. Welcome to day two of the panel. I'm honored to be sharing the bench with Judge E. Grady Jolly, who's in Jackson, Mississippi, and Judge Andrew Oldham, who's in Austin, and I'm in Shreveport, Louisiana. As I said yesterday, we have the circuit covered. We are in the in-bank courtroom of the John Minor Wisdom Court of Appeals building via Zoom, so we're treating it with all the allure of that. So you're lined up here. We call the case 19-11309, United States of America XRL versus Bryan White, etc. All right, counsel, you have, you know, kind of portioned your time into these bite-sized nuggets, so just be aware that we have read the briefs, voluminous as they are, and we're familiar with, you know, all this procedural history and so on and so forth. So given the bite-sized instruments of time you have, you would do well to kind of hone in on the pieces that we most need to deal with. Otherwise, you'll find yourself with a red light, and you haven't covered what you want to do. But it's your time. Use it however you want. All right, first up, Mr. Knight. May it please the Court, Nolan Knight here on behalf of the Bryant-Wendt and Marchand Law Appellates. During my 10-minute allocation, I principally intend to focus upon the lower court's erroneous ruling that the Bryant-Wendt relators purportedly were not proper parties to the underlying action. The issue of proper party status, of course, being the threshold consideration of the framework that this Court established in Federal Recovery Services versus the United States with respect to whether or not FCA defendants, in addition to being liable for proceeds, are liable for litigation expenses, including attorneys. And in fact, under the procedural posture of this case, not only is a proper party status the threshold consideration, it is the dispositive consideration with respect to whether or not the appellees are liable for litigation expenses currently. Because there is no dispute on the current record that the appellees, in order to resolve allegations that they defrauded the United States under the Medicare program and defrauded the state of Texas under the Medicaid program, entered into settlements to resolve those allegations of fraud. The principal settlement agreement being found at Record Site 5000 and the secondary settlement agreement being found at Record Site 7050. And the import, in particular, of the principal settlement agreement is that it defined as the covered conduct that the appellees were resolving, not only the factual agreements of fraud that were included in the first complaint filed by Mr. Capshaw, but separately defined as covered conduct, the allegations of fraud independently averred by the Brian Ritt Relators in their second independent cause of action. And to resolve both categories of covered conduct, the appellees paid approximately or had on their behalf paid approximately $12 billion in proceeds to the state of Texas, to the United States, and to the Relators, which means under the statutory framework of the False Claims Act and the corollary provision of the Texas Medicaid Fraud Prevention Act, the appellees, quote, shall also be liable for litigation expenses if, in fact, Relators were proper parties. And they were. The lower court, we respectfully submit, erred in concluding otherwise. The substantive nature of the lower court's analysis was that, according to the lower court, by viewing the factual averements articulated in the Capshaw complaint, that purportedly would have directed the United States in an investigative context to the essential facts that purportedly would have enabled the United States to discover the separate fraudulent scheme averred by the Brian Ritt Relators. We respectfully submit that that conclusion cannot be reconciled with a faithful application of Rule 12b principles or with the manner in which this court's jurisprudence reflects. It has narrowly drawn the notion of what it means for the United States to have essential investigative facts. With respect to the rule... Mr. Knight, I'm looking at a chart. I guess, actually, two charts. One that appears on the Record on Appeal, page 76 and 77. I guess the chart, I'm sorry, is on page 77. And then another one that's on the Record on Appeal at 1583. And one is a chart with the Capshaw Relators included to explain how the scheme worked, the fraudulent scheme. And the second is the one that I believe your clients, your Relators, submitted in a joint complaint with the Capshaw Relators to explain how the exact same scheme worked. And the visual similarities between these two charts are really striking. The entire notion of the scheme is laid out in the first chart. And then the second chart adds a few names of people. Curro, for example, is added. There's just other different ideas about who owns different parts of different entities of the scheme. Gifts and cash is an additional part of the kickback. But the charts seem to show, you know, that we often say a picture's worth a thousand words. These charts seem to show exactly the same thing of the kickback scheme. So how is it that the government was not on notice from the Capshaw Relators of exactly what was happening in this case? Your Honor, I'll make reference to the chart that we included in our briefing. What I think is one of the critical differences with respect to our chart is the reference to the non-defended participants. And the non-defended participants were approximately a dozen facilities, nursing facilities, assisted living facilities in the North Texas community, as well as several dozen staff level physicians or nursing personnel in those facilities. Is this on the left side of the, I didn't mean to interrupt, but is this on the left side of your chart? The ones that say businesses which are all owned by Curro, White, and or Kumar? Is that the side you're talking about? On page 24 through 26 of our brief. Of your brief, I'm sorry. Please proceed, I'm sorry. On the right side, the right hand column, there are dozens upon dozens of either facilities or staff level physicians or nurse personnel who were only identified in the Bryant-Witt-Relator's second cause of action. And the import of that is that the White Part A entity that is referred to as Hospice Plus would utilize what it referred to as marketers, which was a euphemistic notion for individuals who went out into the North Texas medical community to try to identify facilities or practitioners who were willing to participate in the fraudulent scheme. And the way that the marketers did that was the utilization of cash or in-kind gifts paid to this entirely different group of individuals to incentivize those individuals to send an entirely different population of referral sources back to the White Part A entity. Mr. Capshaw did not, in his complaint, at all make reference to the use of this marketing scheme, did not, in his complaint, make reference to the fact that there are these approximately dozen facilities, and did not, in his complaint, make reference to the several dozen staff level physicians or nursing personnel who were the essential actors in the inegality of the scheme. The reason that we respectfully submit that that is not conclusive with the kind of inference that the lower court was limited to making under Rule 12b standard, whether it be 12b6 or 12b1 in this context, is because nothing on the face of the Capshaw complaint specifically would have directed the United States to these considerations, and there is no evidence of a record to even infer that Mr. Capshaw was in a position to identify any of the facilities or any of the dozen participants. By comparison, this court's ruling in the branch consulting case, we think, is particularly illustrative of why that is beyond the narrowly drawn manner in which this court has defined the United States having the essential facts. Because of the branch consultants, one complaint identified a group of individuals under a specific scheme. The second individual came in and not only identified a broader range of defendants, but non-defendant, as referred to in that case, auditing firms who were essential to understand the nature of the broader scheme. At minimum, we have done that, but I also think what we've done here is consistent with what the court found in the Christus Health case, where it found that although the same hospitals, the same physicians, that during the same time periods engaged in those same hospitals, those same physicians in the same time periods used billing code to defraud the United States, whereas in the second scheme, the same hospitals, the physicians, and during that time period used discounted rent to incentivize participation. That is precisely the kind of dichotomy that we see on the environments in the Brian Witt relate towards environments in contrast to the environments that we see in the Capshaw complaint. So, when we're in a 12-B context and we're talking about inferences that must be drawn that favor the Brian Witt relate towards, we think that that is positive of why the lower court erred. One other consideration. Mr. Knight, let me ask you, just as a matter of information, how much in fees are being claimed for by, I guess, Mr. Bard and Marchand, respectively? Yeah, I think at the time of the lower court proceedings, it was in total approximately $2 million, approximately $500,000 from Marchand law, and I think upwards of a million. So, it was probably shy of $2 million by Bard and Associates. But another consideration that has to be factored in is that under the FCA and the Texas Medicaid Fraud Prevention Act, the fees incurred in the appellees. So, the amount has... So, Ball Park is about, what, $3 million? No, Your Honor. I think it's still around the $2 million mark. Okay. Just curious. All right. I interrupted you and you don't have any rebuttal time, so I'll give you kind of a one sentence, whatever the thoughts you want to leave with us. Certainly. The final observation that I wanted to make is that the United States and the state of Texas have as much of a vested interest as anyone in ensuring the coherent and sound operation of the FCA and the Texas Medicaid Fraud Prevention Act scheme. And the fact that neither have assented to the position of the appellees or the lower court that the Brian Whitt Related Tories claim should not have been allowed to proceed on the merits, we think speaks volumes with respect to their proper party status. Thank you. All right. Thank you, sir. All right. We'll shift to Ms. Doeb. Good morning. May it please the court, I am Katherine Doeb. I'm here on behalf of Appellant Boyd and Associates. I have three big picture points to make. The third one, supplementing Mr. Knight's arguments regarding the merits of the case. First of all, that as a non-party that's nonetheless bound by the district court's denials of its requests for attorney's Boyd and Associates does have the right to appeal. Second, Boyd and Associates timely filed its appeal within 60 days, 60 days because the government was an intervener, within 60 days from the final order from which it appeals. It wasn't obligated to file, to appeal the prior order denying its fees under the False Claims Act without, uh, before there was entry of its order on the Texas Medicaid Fraud Prevention Act, the TMFPA. Finally, even if the False Claims Act is jurisdictional, Bryan and Wendt did not allege the same elements of fraud as those previously alleged by Capshaw. The charts, I think, tend to show the different parties for the most part, and there were different parties. But Bryan and Wendt were the first to file the allegations of the so-called payola scheme. Their claims were not barred. Their attorneys, as assignees of their statutory fees, were entitled to recover their fees. And even if the schemes had been based on the same elements of fraud, and they weren't, Bryan and Wendt were indisputably the first to file claims on behalf of the state of Texas under the TMFPA. And their attorneys, as assignees of statutory fees, were entitled to recover their fees. Can we start with that last point about the attorneys and the right to appeal? Suppose I'm a plaintiff and I have four claims against a defendant. So I hire three law firms and I keep one for myself. Does that mean I get four appeals? No. Why? The party has only one injury, one final order from which it's appealing. Right, so I get my one, but my attorneys all get their three because I assigned my claims to them. So can I do that? Yes. What about this? Suppose I have my four claims and I've got a big legal bill with my attorneys from the cases I did in 2019. Say I owe them a million dollars. Can I assign the entire case to my attorney? I can utilize compensation basically for the million dollars I owed them from 2019. That's an interesting question. I haven't considered whether a client can assign its fees. It's a cause of action. I know that a chosen interest is assignable and the party with an interest in the fee is allowed to appeal. So I would say that's entirely possible that you could have assigned it to all of the attorneys. If you assigned your merits to your attorneys, then the merits decision would be the order from which the attorneys would appeal. They would appeal together. They wouldn't necessarily have to appeal together. There's nothing that requires different parties or different non-parties to file the same appeal. Multiple parties appeal from decisions all the time. There's nothing in the rules requiring you to file your appeals together. In this case, our appeal needed to be separate from Marshawn's because we requested fees under the TMFPA and Marshawn did not. The argument that you're presenting to us today has nothing to do with the unique, I mean I shouldn't say it that way, but you're arguing a much broader proposition than simply your entitlement to fees under the TMFPA, right? You started with three different propositions which are not limited to the Texas state law. Yes, that's true. The Texas state law is not really the problem before this court. The issue is that the district court denied attorney's fees under the False Claims Act. To do that, the court had to construe the first to file bar under the False Claims Act as modifying the grant of jurisdiction under the facts. Now, the problem here is that the court had to add concepts and limitations to the grant of jurisdiction in order to do that. They had to add language when the language was clear. They had to add only the same party can bring the state law action, only in the same case may they bring it, only at the same time may they bring it, and the statute doesn't say that at all. It simply doesn't. Moreover, that violates canons of statutory construction that a narrower provision of the same statute governs broader provision. There's a narrow grant of jurisdiction to any state law case based on the same facts as a False Claims Act case. Doesn't require them to be in the same case, doesn't require it to be the same parties. The first to file bar, on the other hand, is very broad. It says nobody but the federal government can bring or intervene in an action after a first to file person had done so based on the same facts. They're in contradiction, definitely. Neither of them is ambiguous, either. Which one should modify the other? The three courts, I believe it's three that have decided that the grant of jurisdiction needed to modify the first to file bar. It makes sense under statutory construction. It makes sense because we didn't have to add provisions to either of these. It makes sense because it's an exception. I didn't want to use any more of your time on this because I want to make sure you had a chance to get all your stuff up. If you're done, I have one last question for you, which I just want to make sure I understand your position, which is the Boyd & Associates firm can stay back in the district court while everyone else appeals to file a new application for fees under the Texas state law, then take a second appeal and argue not just the Texas statute but also the rest of the broader issues, basically getting a second bite at the apple for everything else that the relators and Marchand have already briefed. Is that the position? We didn't get a second bite at the apple. We got our one bite and we have that right under the Devlin case. A non-party has the right to appeal. All right. All right. Thank you, Ms. Jove. You've reserved some rebuttal time. All right. So we will hear from Mr. Guthrie. May it please the court, I'm Andrew Guthrie and I represent Akiro Appelese, a group of defendants who settled out of this litigation more than three and a half years ago. And just a few months before that, the district court properly dismissed all the claims brought by Bryan and Wendt under the yet we're continuing to litigate their right to ease what they say under the prevailing party provision of the FCA. Now you just heard Mr. Knight concede that, and you saw this in their letter where his son's standing, that the threshold issue, really the only issue that you need to decide, to decide the attorney's fees question, is whether they were properly dismissed under the first to file rule and they were. And I want to focus my time today on that issue. Bryan and Wendt's second filed claim was barred as a related action under the first to file rule because they alleged the same material or essential elements of fraud already alleged in the pending cap shot action. If I still have some time, I want to address briefly the points under Texas law. Those claims were properly dismissed, just the same, and then maybe address a few points on attorney's fees. In the remaining seven minutes, Michael Clark, who represents some of the other appellees, is going to address a few remaining issues, including the standing issues raised in the recent letter briefs addressed by Judge Oldham's questions. So in that way, our division of issues kind of matches up with the appellant's division of issues. So I want to start with the central issue in this appeal, and that's the dismissal on first to file grounds. You've seen the text. You've read it. I'm sure you've scoured it like we have. I think it's important to note that under section 3730b5, the first to file rule bars a second related action based on the facts underlying a pending action. It doesn't just bar identical actions, which is really how the relators are asking you to interpret this provision. But what this court said in branch consultants in construing this provision, that a related action, a second action is related and therefore barred when it alleges the same material or essential elements of fraud. And what the court in branch consultants said is this test is not concerned about whether the second relator piles on additional details of the same essential claim, whether they can marshal additional facts. And the reason, as the court said in branch consultants, is that once the government knows the essential facts of an alleged fraudulent scheme, it has enough information to discover related frauds. There's that term again, right? So Congress, as a policy decision, made a choice that we're not going to let a second set of relators come in and make that leap from one related fraud to another related fraud and then reap some of the recovery. Once the government knows the essential facts, then the claims are and just because we've got some additional details doesn't change that. And here, the district court properly applied that standard to find that the first to file bar apply because in both of these complaints in the capsule complaint and the Brian went complaint, the relator is alleged that white Kumar and the entities that they owned and operated falsely certified compliance with the anti kickback statute in order to receive claims for reimbursement from Medicare and Medicaid. So I think it's really important when we're doing this analysis to remember that the alleged fraud here, what we're talking about is a violation of the False Claims Act. And what this court has said time and time again, the essence of a False Claims Act violation, the heart of that is the submission of a false claim to the government. And here, the claims were alleged to be false for exactly the same reason, right, not because they were alleged to be factually false, in that these services were never provided. But both complaints alleged the submissions of claims were false because they were legally false, in that they were procured in violation of the I do think it is a useful at least visual example of how these allegations line up. And I don't have it in front of me. But the one that that I focused on was the one in capsules original complaint, particularly since that's the most relevant complaint here. And that's it. Record on appeal 77. If you look at those, the column on the left, that is the white and pure white and Kumar entities that were named as defendants in the capsule complaint. And I think what's most important about the chart is that diagonal set of vertical arrows showing those entities making claims for payment to Medicare for reimbursement for these hospice and home health services. Both complaints alleged that those claims that arrow, if you will, was false, because it was that's the same allegation. That's the same essential element of fraud of a false claim on the government. And the fact that Brian and went alleged different forms of kickback, the sort of underlying kickback that gave rise to that violation, that alleged violation, that's the kind of detail, as this court said in branch consultants, that a relator can't use to avoid the scope of the first file rule, because once the government has the essential facts, it can discover related frauds. And I actually think the differences in the underlying kickback allegations are pretty similar to the differences that were disregarded by this court in the Planned Parenthood case. Now, I recognize that's an unpublished decision, but it's persuasive authority, at the very least, of how one panel of this court understands the rule to work, and I think how it should work. So the court in Planned Parenthood looked at a set of complaints, and the second one was described as being different in kind from the first. The court nevertheless held that the bar applied. So what was going on there? In Planned Parenthood, one complaint alleged that Planned Parenthood submitted claims for reimbursement for services that were never performed. The other complaint alleged that Planned Parenthood submitted reimbursements for services that were performed, but they used the reimbursement code, presumably a higher reimbursement code. Now, those are different facts at the ground level. In one set of claims, someone received services, and they just used the wrong code. In another set of claims, there were no services provided at all. Those are different ground-level facts. But what the court said is that those differences don't matter, and here's why. And I'll quote. The court said that both complaints essentially allege that the fraud was and billing Medicaid programs for services other than those rendered, close quote. So what the court said is that the additional facts, the additional details weren't sufficiently different to take this out of the rubric of a related action under the first-to-file rule. And so I think what's probably most important about that holding is that it tells us what we look for when trying to determine the material or essential elements of a False Claims Act violation. And that is, what is the nature of the false claims submitted to the government? In Planned Parenthood, it was claims, it was fraud for billing for services other than those rendered, despite the differences between how those facts actually happened on the ground. Here, the essential false claim allegation is claims for services that were procured in violation of the anti-kickback statute. Those are the same essential claims. I'll also say that the holding in Planned Parenthood tracked closely with this court's opinion in branch consultants and the holding in branch consultants, which was that the second filed claim there was barred, at least as to the two because it alleged the same general conduct and theory of fraud. This was insurance fraud arising out of Katrina, out of wind and flood damage. But the court held that the bar applied, even though the second complaint in branch consultants alleged the same fraud in a different state, right? These were different homeowners. These were different adjusting firms. And I think that point is interesting from branch consultants because I think this point directly undercuts the non-defendant's piece that the Bryan and Wynne relators have stressed. So in branch consultants, it necessarily, the second complaint, so I'll back up. The first complaint was the Rigsby complaint, which this court has had in front of it several times. The Rigsby relators were adjusters that worked for State Farm and Allstate and said, hey, we saw this fraud. They brought the complaint. In branch consultants, the second complaint, the Rigsby's weren't the adjusters. It was some other adjusters. And under the allegations, it's the adjusters who are having to make sort of the ground level misconduct of misrepresenting what the flood damage was. But the addition of these non-defendants, and some adjusting firms were named, other adjusting firms weren't named. But the addition of the non-defendants, it didn't take it out of the reach of the first to file bar. What the court said was, because these allege the same material or essential elements of fraud, the second complaint is barred. That's what we have here. And I'll also say that branch consultants answers the relator's argument that they spend a lot of time stressing that the defendants were different, that the non-defendants were different in the second complaint. But branch consultant shows us that doesn't matter. It was still a related fraud. Three out of the five, so there are five defendants sued by the Bryan and Wendt Relators. Three out of the five defendants are pretty easy to handle. That's White, that's Kumar, that's Hospice Plus. They were already named as defendants in the first case. They were renamed as defendants in the second case. And that applies to branch consultants on all fours. When it's the same defendants, the first to file rule applies. The two remaining defendants, ITS and Tiro, the rule applies to them just as well because there's a discussion at the end of branch consultants. And now, granted, the Fifth Circuit, this court didn't have to extend that rule in branch consultants. But what it did is it reviewed authorities from the Hampton Court in the D.C. Circuit, the Greenberg Court in the Tenth Circuit, and found that these courts and first to file rule applies when the second lawsuit sues close corporate relatives of defendants who were already named. And ITS was alleged to be the ultimate. Your argument assumes that the first, the federal first to file bar applies with equal force to all claims asserted under the Texas statute. Is that correct? It does, Your Honor. And thank you, Judge Jolly, for moving me along. I needed to get to that point. Yes is our answer, that the federal first to file bar is broad enough in its language. And this court has emphasized the breadth of that language, that in barring related actions based on the same material or essential elements of fraud, that that encompasses these copycat claims under the Texas Medicaid Fraud Prevention Act. Under what authority? Under what federal authority can the federal court assert that power over the state claims that are independent of the federal claims? Yes, Judge Jolly. And what I would say is it's section 3730b-5, it's the first to file bar, read in conjunction with section 3732b, which Ms. Jobe addressed. And that provision provides, we think narrowly, for supplemental jurisdiction over state law claims that are connected to a proper claim under the FCA, right? So when that provision is not inconsistent with applying the state law claim that is attached to a federal claim that fails, and Judge Jolly, I see my time is up. Can I finish my answer? Oh, absolutely. Go ahead and finish the question, the answer. When you've got a state law claim that is a copycat of a federal claim that is also barred, the first to file rule takes out both of those claims, and the supplemental jurisdiction provision doesn't save that. There's just, there's nothing inconsistent about those provisions. Well, I mean, in assuming that one could come into federal court with their state claims on the basis of diversity jurisdiction, would that create a more difficult situation for the federal, the application of the federal first to file bar against those state claims? What I would say, Your Honor, is, so you're putting up a scenario where the state claim is the only one brought ever in federal court, and it raises diversity jurisdiction. Well, I'm, no, I'm saying that, I'm saying that you have the federal, you have the federal, the FCA claim pending in federal court, and then the party intervenes on the basis of diversity in jurisdiction, or tries to intervene on the basis of diversity in jurisdiction, asserting the federal, the state claims, independent of those that were asserted in the federal claim. What sort of authority does the, this in the federal court to apply the federal statute to those state law claims? Your Honor, I'd say it's, it's the plain text of the first to file rule that bars related actions that are, that are based on the same material element. Is the first file bar in the FCA powerful enough to bar Texas claims that are, have a completely different legal source and jurisdiction source? And, Your Honor, I would say it is powerful enough to do that in federal court. I'm not convinced that it's powerful enough to bar that claim in Texas state court. That's the preemption issues that we sort of referenced in our briefing, but our position is, Your Honor, yes, that that would be powerful enough, particularly when combined, when you read it with the supplemental jurisdiction provision to bar that state claim. At the same time, are you conceding that in state court that the first to file bar of the FCA would not bar Texas claims filed in a, in the Texas courts? Regrettably, I'm not ready to go that far just because I haven't dug into, there's a reference in Judge Godfrey's opinion, the district court's opinion, that conflict preemption might apply because of bringing these copycat actions in federal court undermines the federal purposes of the FCA. If that happened in Texas state court, I think we'd have a harder road. I'm not ready to say it would be a loser, Your Honor. Okay. All right. Any additional questions of Mr. Godfrey, Judge Oldham, Judge Jolly? We good? All right. Thank you, Mr. Godfrey. You've exhausted your time. We'll hear from Mr. Clark. Thank you, Your Honor. May it please the court, my first represent the Kellys, the, what I call the white and Kumar Kellys, Brian White, Suresh Kumar and their related entities. And I had two issues that I was planning on arguing to the court, but one of them has been conceded, and that is the finality of the dismissal on October the 2nd. I think in the letter brief, it was made clear by Mr. Dyed on behalf of Mr. Marshawn's law firm and the two relators that they are not seeking to undo. And they have conceded the finality of that order as being dispositive. Mr. Boyd had also essentially conceded that the October 2nd order was a final merits decision. As I analyze this procedural case, there's actually, as the court knows, there's actually two different settlements that were involved. The first carved out the Kuro defendants and left the white and Kumar defendants. And so as we analyze the issue, which is the next issue, does Mr. Boyd have standing to seek attorney's fees at this juncture? Our initial argument, which we think is controlling, is that no, he doesn't before the court, at least as to the second final settlement, because he was untimely in perfecting his appeal on the merits order. So to the extent that he was timely in effecting the appeal on the attorney's fee order, we believe that he can't get there because there's no way that he can demonstrate that he's a prevailing party because he can't undo the merits. That leaves open, of course, the carve out and the first settlement, which is a different animal. But it's clear under the that a decision on the merits is a final decision. So the filings of the motions to correct that was withdrawn really didn't change the matrix of the timeliness of appealing the final order, which was on October the 2nd. And that's our position that in addition to that, it's kind of an odd situation because Mr. Boyd withdrew his motion to correct as though that would have an effect to start with because the motion to correct when you drill down into that actually only asked the court to maintain its jurisdiction to hear the attorney's fees issue. And this wasn't the first time that that issue had been raised. I think this was actually the third time that it was considered. To the extent that Mr. Boyd had standing, his standing is derivative in nature. And as I think it was pointed out in the request for the letter brief, here we have an unusual situation that hasn't really been presented to our knowledge before to this court, which is where you have the actual relators, if you would, the real party in interest. Well, that's probably a mischaracterization. The real parties in interest here is the United States of America by nature of the federal statute. But the linchpin would be the prevailing parties and statutorily on a false claim back to be a prevailing party in a ton of attorney's fees. You have to be one of the named relators. But again, here we have, unlike in Lipscomb, which was posed, I think, very, very saliently. We have the relators themselves asserting an interest in this appeal, joined with Mr. Marchand. Mr. Marchand, through his counsel, Mr. Knight, has written and set out clearly that they went ahead and filed what they thought was a proper protective notice of appeal. And they took no position as to the timeliness of what Mr. Boyd and Gordon Associates did before the court. But we think that the fact that the appeal on the attorney's fee order came far too late pretty much ends that analysis. They don't have a basis. I kind of analogize it to the Texas two-step dance. You have to do both steps to be in a position to obtain the attorney's fees, and they fail. Mr. Clark, what do you make of the cases from the Supreme Court and our court talking about the right of an assignee to step into the shoes of the assignor for purposes of party status, appellate standing, however you want to conceptualize it. The idea is that the assignee can appeal the same way the assignor could. And how does that apply in this case? Well, I think that that rule is obviously, has to be a limited exception to the general rule of standing or prudential standing. And in a situation where you do have the little relators in the foster appealing, they have some reason to be appealing. I know that they have apparently assigned some interest to the collection of the attorney's fees, but they are there and they are effectively controlling the issue along with Mr. Marchand and Mr. Boyd. But statutorily, the party that is entitled to be awarded the attorney's fees has to be who Congress said it is, which is the prevailing party. And so as I stand here, this is a different and unique circumstance where the interest of Marchand and the interest of Boyd and Associates is actually being litigated by the proper party. And that is the dismissed relators that are here. So I the distinction with the difference, Your Honor. I think the case that helps me with that is the Evans case out of the Supreme Court, the 1988 or 86 decision that says that fee claims belong to the party and can be waived by the party. But again, here, the statutory scheme requires a prevailing party. There's absolutely no way, at least as the second settlement, that Boyd and Associates can be the prevailing party. The government intervened and finally dismissed by the right to do that, as it is really the pro-party interest. My time is up. Unless there's any questions, I thank you for your time. All right. Thank you, Mr. Clark. I believe we have your argument. All right, Ms. Jobe, you reserve rebuttal time. Two minutes. Yes. The Devlin Court, the Supreme Court, when they held that a person bound by the order from which they're appealing said that this is not a matter of standing under the Constitution. It's not a matter of prudential standing because the person appealing had been injured by the order appealed from and they were not attempting to bring somebody else's claims or bring a claim that was better that the material elements are the underlying cause of action, that it's kickbacks. There are two very different schemes in the Capshaw and in the Bryan and Wendt cases. Capshaw had a structural scheme where the defendants took over a bankrupt entity, basically, and propped it up by giving them free rent and free loans, loans that were not expected to be paid back. They did this for circular referrals among their entities without it being clear to the public that they were related entities. This also violated the Stark Act, not only the Anti-Kickback Act. Moreover, in Branch, identical claims against different parties, not just the words, same material elements, but if you watch how it's been applied, it's the scheme, the facts of the underlying scheme, not the cause of action that determines whether it's a different or the same claim. All right, Ms. Cho. Yes, ma'am. Thank you. All right, counsel, we appreciate your briefing initially as well as your responses to the supplemental briefing requests. We have those plus your arguments. The case will be submitted and we'll get it decided as soon as we can. Thank you.